## STIERS MANAGEMENT CO. v. FIDELITY & DEPOSIT CO. OF MARYLAND (STIERS et al., third-party defendants).

### No. 8301.

United States District Court
E. D. Missouri, E. D.
July 28, 1952.

Robert Nagel Jones, of St. Louis, Mo., for plaintiff and third-party defendants.

Walther, Hecker, Walther & Barnard, and Herbert E. Barnard, of St. Louis, Mo., for defendant and third-party plaintiff.

HULEN, District Judge.

This is a declaratory judgment action to determine premium obligations to defendant of plaintiff and third-party defendants brought in by the original defendant, on a performance bond, for government construction work. Plaintiff seeks a refund. Defendant counterclaims for furter premium payments. The issue is whether additional work done by plaintiff, not called for by the original contract, under a subsequent amendatory agreement, changes the premium rate on the bond from that prevailing at time of original contract to a lower rate prevailing at time of agreements between plaintiff and the government for additional work.

Plaintiff made a lump sum Class B Construction Contract (No. 12 r 13047) with the United States of America, through the Department of the Interior, on June 23, 1941, for a portion of a Continental Divide Tunnel Excavation (Station 72–00 to Station 152–00 and concrete invert, Station 6–00 to 148–00) at the Colorado Big Thompson Project, Grand Lake, Colorado.

Plaintiff executed written application to defendant for a performance bond. Defendant, as surety, executed for plaintiff, as principal, with the United States, as obligee, a performance bond in the penal sum of $417,000, and a payment bond in the penal sum of $416,453. These bonds guaranteed the performance of the con-

struction contract and payment for labor and material of the work provided for in the contract.

The original contract authorized the United States to make changes in the drawings and specifications. It also authorized the United States to require extra or additional work to be performed by the plaintiff—"notice of which modifications to the Surety being hereby waived * * *." The terms of the payment bond of defendant followed the terms of the construction contract as to waiver of notice of modifications.

An amendatory contract was executed by plaintiff and the government September 30, 1942. At the time of execution of the supplemental contract on September 30, 1942, the government required plaintiff to secure from defendant a written consent, on a form prepared by the government, as follows: "The undersigned, the surety on the performance and payment bonds given in connection with said contract dated June 23, 1941, hereby gives its full consent to the foregoing Amendatory Contract and agrees that its bonds be applied to and cover the original contract as modified and extended by or pursuant to the terms and provisions of said Amendatory Contract." No new bond or further consent was ever executed by defendant.

Plaintiff has performed its contract with the government.

The United States issued eleven extra work orders and three change orders, requiring the plaintiff to perform extra or additional work, all of which work was within the general scope of the original contract and of the same general nature as that provided for in the original contract. There was no stipulated time for completion for any of the extra work or change orders.

The contract, as supplemented by extra work orders and change orders, was completed October 31, 1947. Plaintiff laid down railroad tracks which were extended as the tunnel was bored into the mountain. The original contract required plaintiff to make a concrete flooring or invert. This installing of the final concrete invert was not completed until very near the completion date of October 31, 1947, as this work was done the plaintiff withdrew and removed the tracks.

Plaintiff by application for defendant's bond agreed to pay the defendant a premium of one and one-half per cent, as follows:

"First, to pay to the Company, in advance, the following premiums: the premium of Twelve Thousand Four Hundred Ninety-Three and 59/100 Dollars ($12,493.59) for the contract bond and the labor and material bond, if any (the premium for said contract bond and labor and material bond, if any, being at the rate of 1½% of the original contract price), for the term of Two Years beginning on the date of said contract bond, or any part of said term; and an annual premium in advance for each year after said term at the rate of —— of one per cent of said contract price, and an additional term and annual premium at said rates, based on any *increase of said contract price,* as shown by the certificate of the engineer or architect in charge, and to be adjusted upon completion of said contract, such annual premiums to be paid as long as liability on said contract bond shall continue after said term and until the undersigned shall deliver to the Company, at its Home Office in Baltimore, Maryland, written evidence, satisfactory to the Company, of its discharge from such liability." (emphasis added)

The final contract price paid the plaintiff was $4,274,840.93. Plaintiff paid the defendant premiums on the bonds at the rate of 1½% of the contract price, as follows:

September 30, 1941 ............$12,493.59
February 25, 1943 .............  5,372.13
July 1, 1943 ..................  2,023.99
August 3, 1943 ................  1,409.26
August 2, 1944 ................  5,137.65
September 2, 1945 .............  7,322.54
February 12, 1946 ............. 15,060.93
Total .........................$48,820.09

Plaintiff states its case, by brief:

"The most reasonable and fair construction [of the bond] is that these

Work Orders were new agreements, and plaintiff and defendant intended that the bond should apply to any such as were agreed to by plaintiff and the Government. This being true, the rate chargeable should not relate back to a previous peak figure effective when the parties began to do business on the tunnel, but should involve the applicable rate in effect on the respective dates of the commencement of the defendant's various bond liabilities, small or large."

During the period involved, defendant, as a member of the surety association, adhered to the premium rates fixed by the surety association, published in the Towner Rating Manual. The applicable premium rate, promulgated by the Towner Rating Bureau and in force at the time of execution of the bonds for construction contracts, Class B, of less than $2,500,000, was $15 per $1,000 on the contract price.

A $10 per $1,000 premium rate was promulgated by the Towner Rating Bureau on October 28, 1941, and was applicable to all bonds issued in favor of the United States of America, or any Department thereof, covering Class B construction contracts of less than $2,500,000, on the following conditions:

"1. Reduced rates shall apply to bonds written December 26, 1941 or thereafter.

"2. Stipulated time for completion of contract shall not exceed twelve months.

"3. Performance and payment bonds shall continue to be in substantially the same form as now required by existing statutes or regulations.

"4. The reduced rate is for the period ending April 30, 1942, at which time a further review will be made in the light of the then existing conditions.

"5. Contracts of $2,500,000.00 or more will be specifically rated by the Bureau and the basic rate will be subject to gradation depending upon the size of the contract."

The stipulated time for completion of the original contract was 500 calendar days.

There was in force during the period of this contract, the following provision in the Towner Rating Bureau Manual:

"3. *Separate Contracts:*

"If a general contractor undertakes the erection of a building or the construction of any other improvement classified as construction Class B * * * that classification and rate applies to the entire work and to all his contracts which fall within its scope; and the classification and rate *is not changed by dividing the work into separate contracts* nor is the classification and rate changed by the fact that any part or all of the materials are furnished to the contractor by the owner or others than the contractor." (emphasis added)

In order to secure defendant's bond plaintiff had to make deposit of certain collateral in a substantial sum. In July, 1943, plaintiff attempted to substitute an executed performance bond and payment bond written by another surety company in lieu of defendant's bonds. Such substituted bonds were rejected by the United States on the ground that there was no authority for such substitution. These bonds also provided for a premium at the rate of 1½% of the contract price. Plaintiff's witness attempted to make it appear the change was for the purpose of securing a lower premium, but we think it manifest from all the testimony that his purpose was to withdraw collateral held by defendant.

On various occasions, even after completion of the work, plaintiff was trying to collect the premium of 1½% from the government.

Plaintiff received a final payment from the United States of $217,895.51 in October, 1951. Suit was first filed by plaintiff October 19, 1951, and dismissed. This case was filed December 10, 1951. Defendant has at all times demanded settlement of the premium on a basis of 1½% of the contract price. Prior to filing suit plaintiff did not deny such liability to defendant.

Defendant's counterclaim is for 1½% of the contract price of $4,274,840.93, less the payments of $48,820.09.

## I.

This is a diversity case involving a sum in excess of $3,000, exclusive of interest and cost, and the Court has jurisdiction.

## II.

▊ Plaintiff and defendant contracted, in writing, for execution of the bonds by defendant, and plaintiff agreed to pay a premium of 1½% of the contract price, or $15 per thousand, plus a like sum on any increases in the contract price. There is no claim that the parties ever by express agreement changed the terms of compensation for the bond. As to plaintiff's claim that usage, custom and the rates issued by the Towner Rating Bureau, subsequent to execution of the bonds by defendant, by implication decreased the bond premium on the contract price of work covered by certain change orders and extra work orders, plaintiff has the burden of proof. It has failed to sustain it. All the evidence points to the conclusion that the premium on the bond, as originally set, did not change under the circumstances of this case. It may be that plaintiff was not legally bound to accept any one or all of the change orders or extra work orders, but defendant covered them on its bond and it required no independent agreement to bind it.

▊ We cannot agree with plaintiff that the extra work or change orders were independent contracts, of a nature to change the terms of the contract for the bond. When the government required defendant's signature to the amendatory contract, the government's form provided defendant's bond would apply "to and cover the original contract *as modified* and extended by or pursuant to the terms and provisions of said amendatory contract." No further notice was given to defendant. All extra work orders and change orders were made pursuant to the original contract as modified and extended by the amendatory contract. This negatives plaintiff's claim that extra work orders and change orders were to be considered new and independent contracts in so far as the obligations of the bond were concerned, or obligation to pay premiums under the term of the original bond. The record of plaintiff's conduct is one continuous confirmation that it understood its premium obligation was fixed by the original bond agreement. Repeatedly plaintiff attempted to get the government to pay the premium of 1½%. Plaintiff tried to substitute a bond at the same rate in order to take down collateral held by defendant.

All of the work done by plaintiff on the tunnel was of the same general nature and constituted parts of the same project. The surety was liable throughout the period the work was being performed. If we leave the terms of the contract and go to Towner Rating Bureau Manual, there we find ("3. Separate Contracts") a provision that the rate "applies to the entire work and all his (plaintiff's) contracts that fall within its scope." All work done by plaintiff was within the scope of the original contract as amended. "The classification and rate (on the bond) is not changed by dividing the work into separate contracts."

We conclude, for premium rating purposes, the original rate of $15 per thousand dollars of the contract price applies on the total contract price of $4,274,840.93.

## III.

Defendant asks for attorneys' fees under the following provision of the bond application:

"*Second,* to indemnify the Company against all loss, costs, damages, expenses and attorney's fees whatever, and any and all liability therefor, * * * or in enforcing any of the agreements herein contained.

"*Fourth,* to assign, transfer and set over, and does or do hereby assign, transfer and set over to the Company, as collateral to secure the obligations herein and any other obligations and liabilities of the undersigned to the Company, * * *.

"6(d) Any and all percentages retained on account of said contract and any and all sums that may be due under said contract at the time of such abandonment, forfeiture or breach, or

that thereafter may become due."

In the separate indemnity agreement of L. J. Stiers and H. C. Stiers (third-party defendants), they agreed:

"*First* to pay to the company, in advance, the premium or premiums charged * * *.

"*Second* to indemnify, hold and keep harmless the Company from and against any and all loss, liability, damages, costs,. counsel fees, charges and expenses * * *."

■ The application agreement was written by the bonding company. If ambiguous it should be construed against the defendant author.

■ We are not convinced this indemnity agreement, as regards attorney's fees, was intended to cover a case of this kind. The word "indemnify" has a well-recognized meaning. Here the very purpose of the bond was in the first instance to protect the government. In case of any loss of the kinds enumerated, resulting from failure of plaintiff to meet the terms of the contract, defendant was bound under its bond, and any loss in this connection plaintiff agreed to indemnify defendant against. Such was one of the purposes of the indemnity agreement. Can we, in the absence of language so providing in plain terms, extend the indemnity to cover a contest between the principal and surety as to the terms of the bond itself and nothing else? We doubt such was in the minds of the parties. We conclude that the indemnity provided for relates to loss suffered in carrying out the bond obligation as plaintiff's surety, and not to a suit to construe the terms of the bond contract. We will cite a number of cases sustaining our holding, two of which were brought by the defendant in this case for attorney's fees on an agreement not identical but similar to the one here relied on. The only language bearing on the issue, in the agreement in suit, which was not in the agreements in the cited cases, is "or in enforcing any of the agreements herein contained." Strictly construed, the present suit is to enforce the agreement to pay a stipulated commission, but the line quoted is in a paragraph containing ten divisions separated by semicolons, and more than one of the divisions call upon plaintiff to do certain things under certain contingencies. The agreement to pay a premium is no part of the paragraph. To argue that the indemnity applies not only to the subject matter of the paragraph in which obligation to indemnity is set forth, but to other parts of the contract, is to brand the contract as ambiguous in that respect. We think a fair and reasonable interpretation of the bond application and bond is that the agreement to "indemnify" relates to the subjects "herein" in the paragraph where that term appears and not the paragraph setting the premium rate. See Fidelity & Deposit Co. of Maryland v. Crouse, 86 N.J.L. 55, 90 A. 1026; Sanger Bros. v. Fidelity & Deposit Co. of Maryland, Tex.Civ. App., 293 S.W. 1114; National Surety Co. v. Breuchaud, 173 App.Div. 795, 160 N.Y.S. 77; United States Fidelity & Guaranty Co. v. Falk, 214 Minn. 138, 7 N.W.2d 398.

## IV.

The Stiers Management Company, on receipt of the final payment on the contract of $217,895.51, in October, 1951, distributed all of its assets to the individual third-party defendants, Harold C. Stiers and Lewis J. Stiers, with the exception of the sum of $20,000 placed in a bank account in the Tower Grove Bank & Trust Company in the name of Harold Stiers and L. J. Stiers.

The plaintiff and third-party defendants are indebted unto the defendant for $15,302.52, with interest on the sum of $11,344.-51 from February 3, 1947, and interest on the balance of $3,957.98 from October 19, 1951, amounting to $3,920.

Plaintiff surety company is entitled to a judgment, joint and several, against the Stiers Management Company and (by virtue of the separate indemnity agreement) L. J. Stiers and Harold C. Stiers, and the deposit in the Tower Grove Bank & Trust Company in the names of L. J. Stiers and Harold C. Stiers should be impressed with a lien in the amount of this judgment until further order of this Court.